IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| Beattie B. Ashmore, in his Capacity as Court-Appointed Receiver for the Three Hebrew Boys, ) ) ) ) | C/A No. 3:13-1449-MBS |
| Plaintiff, ) ) | |
| vs. ) ) ) | **OPINION AND ORDER** |
| Feleicia Cook, ) ) ) | |
| Defendant. ) ) | |

On May 30, 2013, Plaintiff Beattie B. Ashmore, in his Capacity as Court-Appointed Receiver for the Three Hebrew Boys, filed a complaint alleging that Defendant Feleicia Cook profited from a fraudulent investment scheme orchestrated by Joseph Brunson, Timothy McQueen, and Tony Pough, also known as the Three Hebrew Boys. See United States v. Brunson, Cr. No. 3:08-615. Defendant, proceeding pro se, filed an answer on June 21, 2013. This matter now is before the court on Plaintiff's motion for summary judgment, which motion was filed on October 22, 2013. Defendant filed a response in opposition to Plaintiff's motion on November 7, 2013.

I. FACTS

Beginning in September 2004, Brunson, McQueen, and Pough orchestrated a Ponzi scheme through Capital Consortium Group (CCG), a business entity purporting to exist as a "ministry" for the purpose of debt elimination.[1] Brunson, McQueen, and Pough offered a mortgage satisfaction

---

[1] "'A Ponzi scheme is a scheme whereby a corporation operates and continues to operate at a loss. The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors.'" In re Deriviam Capital, LLC, 396 B.R. 184, 188 n.4 (Bankr. D.S.C. 2008) (quoting Hirsch v. Arthur Andersen & Co., 72

program, automobile note satisfaction program, credit card satisfaction program, and other such schemes through which they promised to pay off debts of participants in exchange for a nominal investment. For example, a participant with a $50,000 mortgage could provide a $1,500 "processing fee" and after approximately sixteen months the mortgage would be satisfied. Brunson, McQueen, and Pough claimed that they were able to obtain such results because participant monies were deposited into "sweep accounts" that were invested in the foreign exchange market nightly. Brunson, McQueen, and Pough represented that the foreign exchange market generated returns of up to 200 percent to 500 percent per night.

Brunson, McQueen, and Pough did deposit some participant funds into sweep accounts at various banks; however, the accounts were interest-bearing accounts earning no more than five percent annually. They also deposited funds into other bank accounts through which they funded a lavish lifestyle. Brunson, McQueen, and Pough initially used a portion of the deposits to pay early participants. As is typical in a Ponzi scheme, the successful elimination of debt of early participants made the scheme attractive to new recruits. To facilitate expansion of their scheme, Brunson, McQueen, and Pough utilized "Independent Representatives" who received fees in exchange for obtaining additional participants. As of May 2007, Brunson, McQueen, and Pough controlled accounts containing approximately $17,000,000. They were obligated through their various programs to eliminate debt totaling over $950,000,000. See generally Superseding Indictment, ECF No. 84.

Upon motion of the government, the court issued a pre-indictment restraining order on August 2, 2007. The pre-indictment restraining order barred Brunson, McQueen, and Pough,

F.3d 1085, 1088 n.3 (2d Cir.1995)).

individually and doing business as various business entities, as well as those in active concert or participation with them, from transferring or disposing of their property, which included numerous vehicles, an airplane, and extensive real estate holdings. The pre-indictment restraining order was extended on August 15, 2007, and the court also appointed Plaintiff as Receiver to assist in the identification and disposition of assets. Plaintiff's duties were described by order filed September 5, 2007, as thereafter amended.

Brunson, McQueen, and Pough were indicted on June 20, 2008. A superseding indictment was filed on August 21, 2008, charging Brunson, McQueen, and Pough with conspiracy to commit mail fraud, in violation of 18 U.S.C. §§ 1341 and 1349 (Count 1); mail fraud, in violation of 18 U.S.C. § 1341 (Counts 2-36); interstate transportation of stolen goods, in violation of 18 U.S.C. §§ 2314 and 2 (Counts 37-46); and engaging in monetary transactions in property derived from unlawful activities, in violation of 18 U.S.C. §§ 1957 and 2 (Counts 47-58). A jury found Brunson, McQueen, and Pough guilty on all counts on November 20, 2009. Also on November 20, 2009, the jury returned a special verdict for forfeiture of property in the amount of $82,000,000.

In this case, Plaintiff contends that Defendant participated in a mortgage payoff program and a student loan program, and also received long term residual payments. Plaintiff alleges that Defendant invested or deposited $11,600.00 and received payoffs totaling $112,834.19, which resulted in a net profit of $101,234.19. Plaintiff asserts causes of action for fraudulent transfer: violation of the Statute of Elizabeth, S.C. Code Ann. § 27-23-10 (First Cause of Action); unjust enrichment (Second Cause of Action); imposition of an equitable mortgage/deed of trust (Third Cause of Action); constructive/resulting trust (Fourth Cause of Action); and equitable lien (Fifth Cause of Action). Plaintiff moves for summary judgment as to all causes of action, including the

equitable remedies that flow from the claims asserted in the Third, Fourth, and Fifth Causes of Action. In response, Defendant admits receiving profits, but states that there are genuine issues of material fact, and that the actions of Plaintiff seeking summary judgment are unconscionable and unconstitutional.

## II.  DISCUSSION

Plaintiff has moved for summary judgment pursuant to Fed. R. Civ. P. 56. Under that standard, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). At the summary judgment stage, it is not the court's role to "weigh the evidence and determine the truth of the matter" but instead to determine whether there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Plaintiff's cause of action under the Statute of Elizabeth and for unjust enrichment are equitable in nature. Oskin v. Johnson, 735 S.E.2d 459, 463 (S.C. 2012) (noting that an action to set aside a conveyance under the Statute of Elizabeth is an equitable action); Ellis v. Smith Grading & Paving, Inc., 366 S.E.2d 12, 14 (S.C. Ct. App. 2011) (observing that unjust enrichment is an equitable doctrine). A clear and convincing evidentiary standard governs fraudulent conveyance

claims brought under the Statute of Elizabeth.  Oskin, 735 S.E.2d at 463.

    A.    Statute of Elizabeth

Plaintiff asserts that the $101,234.19 in profits paid to Defendant should be set aside as a fraudulent transfer.  S.C. Code Ann. § 27-23-10(A) provides:

> Every gift, grant, alienation, bargain, transfer, and conveyance of lands, tenements, or hereditaments, goods and chattels or any of them, or of any lease, rent, commons, or other profit or charge out of the same, by writing or otherwise, and every bond, suit, judgment, and execution which may be had or made to or for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, and forfeitures must be deemed and taken (only as against that person or persons, his or their heirs, successors, executors, administrators and assigns, and every one of them whose actions, suits, debts, accounts, damages, penalties, and forfeitures by guileful, covinous, or fraudulent devices and practices are, must, or might be in any ways disturbed, hindered, delayed, or defrauded) to be clearly and utterly void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

Under section 27-23-10, a fraudulent transfer will be set aside if the plaintiff can establish: (1) the transfer was made by the grantor with the actual intent of defrauding his creditors; (2) the grantor was indebted at the time of the transfer; and (3) the grantor's intent is imputable to the grantee.  In re Derivium Capital, 396 B.R. at 192 (citing In re J.R. Deans, 249 B.R. 121, 130 (Bankr. D.S.C. 2000)).  The existence of a Ponzi scheme gives rise to a presumption of fraudulent intent on the part of the proponent of the scheme. See id. at 192-93 (citing cases).  This is because the "perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money." Armstrong v. Collins, 2010 WL 1141158, *21 (S.D.N.Y. 2010) (quoting In re C.F. Foods, L.P., 280 B.R. 103, 110 (Bankr. E.D.

5

Pa. 2002)).  Further, the nature of a Ponzi scheme leads ultimately to insolvency because the proponent incurs debts beyond his ability to pay as they become due.  See Finn v. Alliance Bank, 2013 WL 4711157 *9 (Minn. Ct. App. Sept. 3, 2013) (discussing Minnesota Uniform Fraudulent Transfer Act); see also Armstrong, 2010 WL 1141158 at *21 (citing cases for the proposition that a Ponzi scheme is insolvent from its inception).

A jury having found Brunson, McQueen, and Pough guilty on the underlying criminal case, the court concludes that the first and second prongs of the test have been met; i.e., Brunson, McQueen, and Pough (1) made transfers to Defendant with the intent of defrauding participants in the Ponzi scheme; and (2) were indebted to participants in the Ponzi scheme at the times they transferred monies to Defendant.  Accordingly, the court turns to the third prong, whether the fraudulent intent of Brunson, McQueen, and Pough is imputable to Defendant.

Under South Carolina law, "[a]ctual knowledge of, or participation in, the debtor's fraudulent intention on the part of the transferee need not be established in order to justify a conclusion that the transaction was illegal. The transaction is subject to attack if at the time of the transfer the transferee had notice of circumstances which would arouse the suspicion of an ordinarily prudent man and cause him to make inquiry as to the purpose for which the transfer was being made, which would disclose the fraudulent intent of the maker." Coleman v. Daniel, 199 S.E.2d 74, 80 (S.C. 1973) (citing Hudnal v. Teasdall, 1 McCord 227 (S.C. 1821)).[2]

---

[2] The court notes that, at least for purposes of bankruptcy litigation, the general rule is that "net winners" of Ponzi schemes, such as Defendant, must disgorge the their winnings.  "'[I]nvestors may retain distributions from an entity engaged in a Ponzi scheme to the extent of their investments, while distributions exceeding their investments constitute fraudulent conveyances which may be recovered by the Trustee.'" In re Dreier LLP, 462 B.R. 474, 485 (Bankr. S.D.N.Y. 2011) (quoting In re Churchill Mortg. Inv. Corp., 256 B.R. 664, 682 (Bankr. S.D.N.Y. 2000) and citing cases).

6

The Receiver has provided evidence that Defendant, like other participants, was required to execute a "Personal Disclaimer/Waiver" as a condition of participating in any business venture with CCG. The disclaimer provided, among other things, that the participant would not disclose the terms, conditions, or particulars of any business dealings with CCG. The disclaimer also required the participant to declare that he or she was "not in any official capacity relative to my involvement in business with [CCG] a member, agent, informant, or employee of any kind of investigative, law enforcement, media, news, postal service or other government agencies within any country, nor am I acting as proxy to any person or entity serving as a member, agent, informant, or employee of any kind of investigative, law enforcement, media, news, postal service or other government agencies within any country." Personal Disclaimer/Waiver ¶ 6, ECF No. 26-2. In addition, the mortgage satisfaction agreement required Defendant "to maintain complete and total confidentiality" and provided that breach of the agreement would subject Defendant to a $1,000,000 penalty. According to Plaintiff, the return on investment for Defendant during an approximately seventeen month period was over 800 percent. The court finds by clear and convincing evidence that Defendant was on notice of circumstances that would arouse the suspicion of an ordinarily prudent person. Plaintiff's motion for summary judgment is granted as to this issue.

B.     Unjust Enrichment

Plaintiff alternatively contends that Defendant was unjustly enriched at the expense of the participants for whose benefit the receivership was established. "'A party may be unjustly enriched when it has and retains benefits or money which in justice and equity belong to another." Inglese v. Beal, 742 S.E.2d 687, 690-91 (S.C. Ct. App. 2013) (quoting Dema v. Tenet Physician Servs.–Hilton Head, Inc., 678 S.E.2d 430, 434 (S.C. 2009)). The remedy for unjust enrichment is

restitution. Id. at 691 (citing Sauner v. Pub. Serv. Auth., 581 S.E.2d 161, 167 (2003)). To recover restitution in the context of unjust enrichment, the plaintiff must show: (1) he conferred a non-gratuitous benefit on the defendant; (2) the defendant realized some value from the benefit; and (3) it would be inequitable for the defendant to retain the benefit without paying the plaintiff for its value. Id. (citing Campbell v. Robinson, 374 S.E.2d 507, 509 (S.C. Ct. App.1988)).

In this case, Defendant obtained a benefit by receiving payoffs totaling $101,234.19 after depositing $11,600.00 into the Ponzi scheme, a benefit that was possible because of the monies contributed by the participants represented by Plaintiff. Further, Defendant realized value from the benefit because the mortgage on her residence was paid in full, her student loans were paid in full, and she received monthly residual checks from April 2006 to April 2007.

The court finds that it would be inequitable for Defendant to "enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky." See In re United Energy Corp., 944 F.2d 589, 596 (9th Cir. 1991). Plaintiff's motion for summary judgment is granted as to this issue.

### IV. CONCLUSION

For the reasons stated, Plaintiff's motion for summary judgment is **granted**. The Clerk of Court shall enter judgment against Defendant in the amount of $101,234.19, with interest at the legal rate.

**IT IS SO ORDERED.**

/s/ Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina
December 4, 2013